IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SCOTT M. and LAURI M., individually and as guardians of C.M., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS d/b/a, Blue Cross Blue Shield HMO Blue, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No.   1:17-cv-00009 <br><br> Judge Clark Waddoups |

## I.   INTRODUCTION

This action arises under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001, *et seq.,* and involves Defendant's denial of insurance coverage for

the residential treatment of C.M., a minor.   Before the court are Defendant and Plaintiffs' cross-

motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

(ECF Nos. 60, 61.)   Having considered the parties' briefs, oral argument, and relevant case law,

the court DENIES Defendant's Motion for Summary Judgment and GRANTS in part and

DENIES in part Plaintiffs' Motion for Summary Judgment.

## II.   BACKGROUND

Plaintiffs sought care for C.M.'s mental health and substance use conditions at Waypoint Academy, a residential treatment center located in the State of Utah. During the relevant time, Plaintiffs had health coverage under a group health benefit plan ("the Plan") sponsored by Scott M.'s employer and insured by Defendant Blue Cross Blue Shield of Massachusetts ("Blue Cross").   Rec. 00744.[1] The Plan provides coverage for medically necessary mental and physical health and/or substance abuse care for its subscribers and beneficiaries.[2] Rec. 00767 – 00768. Blue Cross denied coverage, however, for C.M.'s fourteen-month stay at Waypoint. Rec. 00123, 00194 – 00196. Plaintiffs now seek to recover all unreimbursed, out-of-pocket expenses due to Blue Cross's adverse benefits determination, as well as an award of pre- and post-judgment interest and attorney fees.

### A.   The Plan and Blue Cross's Medical Necessity Criteria

The Plan requires that all health care services "be required services that a health care provider, using prudent clinical judgment, would provide to a patient in order to prevent or evaluate or to diagnose or to treat an illness, injury, disease, or its symptoms."   Rec. 00767. The Plan further details that the required services must be:

- Furnished in accordance with generally accepted standards of professional medical practice (as recognized by the relevant medical community);

---

1  All references denoted "Rec." refer to pages in the administrative record, which were submitted at ECF Nos. 59 and 76, and numbered from 0001 to 00849.

2  The Plan states that its "coverage for medically necessary mental health and substance abuse treatment" is in accordance with "federal and state mental health parity laws."   Rec. 00013.

- Clinically appropriate, in terms of type, frequency, extent, site, and duration; and they must be considered effective for your illness, injury, or disease;

- Consistent with the diagnosis and treatment of your condition and in accordance with Blue Cross Blue Shield HMO Blue medical policies and medical technology assessment criteria;

- Essential to improve your net health outcome as beneficial as any established alternatives that are covered by Blue Cross Blue Shield HMO Blue;

- Consistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by your medical condition; and

- Not more costly than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results to diagnose or treat your illness, injury, or disease.

*Id*.

The Plan provides for inpatient, intermediate and outpatient services to treat a mental health condition.   Rec. 00794 – 00796. The Plan states that intermediate care "may include (but is not limited to)," acute residential treatment, partial hospital programs and intensive outpatient treatment.  Rec. 00795 – 00796.   The Schedule of Benefits for covered Mental Health and Substance Abuse Treatment refers to Inpatient admission at a General Hospital, Inpatient admissions in a Mental Hospital or Substance Abuse Facility and Outpatient Services. Rec. 00113-00115.   Neither the Plan nor the Schedule of Benefits makes any reference to subacute residential treatment.

The Plan defines Covered Providers as:

- Hospital and Other Covered Facilities. These kinds of health care providers are: alcohol and drug treatment facilities; ambulatory surgical facilities; chronic disease hospitals (sometimes referred to as a chronic care or long term care hospital for

*medically necessary covered services*); community health centers; day care centers; detoxification facilities; free-standing diagnostic imaging facilities; free-standing dialysis facilities; free-standing radiation therapy and chemotherapy facilities; general hospitals; independent labs; limited services clinics; mental health centers; mental hospitals; rehabilitation hospitals; and skilled nursing facilities.

- Physician and Other Covered Professional Providers.   These kinds of health care providers are: certified registered nurse anesthetists; chiropractors, clinical specialists in psychiatric and mental health nursing; dentists; licensed audiologists; licensed dietitian nutritionists (or a dietitian or a nutritionist or dietitian nutritionist who is licensed or certified by the state in which the provider practices); licensed hearing instrument specialists; licensed independent clinical social workers; licensed marriage and family therapists; licensed mental health counselors; licensed speech-language pathologists; nurse midwives; nurse practitioners; occupational therapists; optometrists; physical therapists, physicians, physician assistants; podiatrists; psychiatric nurse practitioners; psychologists; and urgent care centers.

Rec. 00761 – 00762.

While the Plan states that Blue Cross "decides which health care services and supplies that [a claimant] receive[s] . . . are *medically necessary* and appropriate for coverage," Rec. 00767 (emphasis in original), a member can initiate an appeal or grievance within one year of the receipt of the service or claim denial. Rec. 00825 – 00827. The Plan also provides that a member may request an external review of an adverse benefit determination after completion of the internal appeals process, or when a Plan fails to make a timely decision on an appeal. Rec. 00829 – 00830.

## B.   C.M.'s Condition

C.M. has struggled with mental health and substance use disorder conditions for many years.   C.M. began to show symptoms of anxiety in the fifth grade when he refused to attend school. Rec. 00200. Over the years, C.M.'s behavior and condition continued to deteriorate.

4

C.M. was eventually diagnosed with Major Depressive Disorder, Anxiety Disorder and Attentional Deficit Hyperactivity Disorder ("ADHD"). Rec. 00161. He also has been diagnosed with Cannabis Use Disorder (severe), Alcohol Abuse, and Amphetamine Abuse. Rec. 00238.

To accommodate his symptoms and assist with his education, C.M. received an individual education plan ("IEP"), to little avail. Rec. 00202.   C.M. continued to struggle with anxiety and depression while trying different combinations of ADHD and anti-depressant/mood medications.   Rec. 00200. As he matured, his symptoms significantly worsened.   He lacked self-control and had frequent emotional outbursts, refused to attend school and was often severely depressed. Rec. 00245, 00534.

After struggling with passive suicidal ideation, in January 2014, when C.M. was fourteen, he attempted suicide for the first time. Rec. 00235. C.M. made additional suicide attempts involving overdosing and planning to slit his wrists. Rec 00241, 00245.

In March 2014, C.M. was admitted to the dual diagnosis program at McLean Hospital, an acute-psychiatric hospital, to address his mental health issues that were leading to his suicidal ideations and attempts, as well as his substance use disorder. Rec. 00235. C.M. reported cutting himself on a weekly basis as a coping mechanism to deal with his depression. Rec. 00235, 00245-00246. C.M. acknowledged ongoing drug use and expressed no interest in stopping marijuana use. Rec. 00235. C.M. remained in the Adolescent Residential Treatment Center at McLean Hospital for two weeks. Rec. 00201. Upon his release, C.M. participated in significant outpatient therapy that included individual therapy, psychopharmacological treatment, family therapy, and a bridge program to help him reenter high school. Rec. 00238 – 00239.

Despite this intensive outpatient treatment plan, in May 2014, C.M. made another suicide attempt, this time overdosing on barbiturates and alcohol. Rec. 00201. C.M.'s parents, Scott and Lauri, removed C.M. from the school setting and C.M. completed the year with the help of a tutor.   Plaintiffs hired an education consultant to obtain an IEP for C.M. and he continued extensive outpatient therapy.

In August 2014, C.M. was again admitted to McLean in its dual-diagnosis program following another overdose. Rec. 00202. C.M. claimed the overdose was accidental. However, one of his therapists, Dr. Robert Tella, who had previously worked with C.M., believed the overdose was intentional. Rec. 00245-00246.

Plaintiffs again put in place an exhaustive outpatient treatment program.   The program included individual therapy, family therapy, neuropsychological assessments, a course of cognitive-behavior therapy, psychopharmacologic therapy and group therapy. C.M. refused to participate in group therapy. Rec. 00246.

In October 2014, C.M. took LSD and attempted to hang himself from a light fixture in his bedroom. Rec. 00202. This last suicide attempt, while key to prompting Plaintiffs to admit C.M. to Waypoint residential treatment center, was not disclosed to Blue Cross at the time of its initial benefits determination or during the internal appeals process. Indeed, Plaintiffs did not disclose the October 2014 suicide attempt until submitting their appeal of Blue Cross's denial decision to the external reviewer on March 27, 2015. Rec. 00197. The external reviewer had full knowledge of the October 2014 suicide attempt.

Having exhausted their intensive outpatient options and fearing for their son's life and well-being after the October 2014 suicide attempt, Plaintiffs arranged for C.M. to be admitted to

Waypoint on October 23, 2014. Waypoint is licensed by the State of Utah as a mental health facility, providing treatment for adolescents. Rec. 00148, 00337-00346. It is a subacute treatment facility.

At the time of his admission to Waypoint, C.M. was diagnosed with Major Depressive Disorder, Anxiety Disorder Unspecified, and Attention Deficit Hyperactivity Disorder. Rec. 00161. Waypoint also notated that C.M. had a "High Risk Factor for Adolescent Boys: Severe Depression and Hard Drug Use." Rec. 00190. C.M. denied that he had a problem with abusing illicit substances, but while receiving treatment at Waypoint, he acknowledged that his substance use was worse than he had historically reported. Rec. 00427-00428, 00517. C.M.'s substance use disorder is a key factor to the court's analysis.

### C.   Blue Cross's Denial of Benefits

Blue Cross received claims for services that C.M. received while at Waypoint, including individual, group and family therapies. Plaintiffs did not seek pre-authorization of C.M.'s charges at Waypoint, as required by the Plan. On October 27, 2014, Blue Cross wrote to Plaintiffs and stated that C.M.'s care was not eligible for coverage because: "[W]e have determined that your child's clinical condition does not meet the medical necessity criteria required for *acute* psychiatric inpatient stay in the area of immediate safety risk." Rec. 00123 (emphasis added). Blue Cross made no mention of C.M.'s substance abuse diagnosis, instead, only addressing his psychiatric diagnoses.

The Blue Cross letter stated that it relied upon the InterQual® Criteria to reach the conclusion that C.M.'s claim should not be paid. *Id*. Blue Cross provided Plaintiffs with an InterQual® two-page Review Summary, which details C.M.'s medical history, including

references to his numerous suicide attempts and his prior hospitalization in a dual diagnosis program for psychiatric issues and substance abuse. Rec. 00127. Although Plaintiffs' Plan does not refer to a subacute standard of care, the InterQual® Summary states that the "Requested Level of Care" is "Psychiatric Subacute Care." *Id.*

Blue Cross then applied the InterQual® criteria for Adolescent Psychiatry. For subacute residential treatment, this criteria requires as clinical indications, social risks and level of care:

- A current psychiatric diagnosis that cannot be managed at a less intensive level of care.

- "Chronic/Persistent danger to self/others" demonstrated by one factor including "self-mutilation," or behaviors that are unmanageable. The behaviors must be present for at least six months and expected to persist without treatment.

- Unsuccessful treatment within the last year of intensive outpatient treatment or at least three psychiatric inpatient admissions.

- A support system who is unable to manage the intensity of symptoms or unable to ensure safety.

- Discharge or transfer from a psychiatric hospitalization and unable to maintain behavioral control for more than 48 hours and improvement expected within the next two weeks.

Rec. 00129-00130.   Despite including this subacute criteria, however, Blue Cross used an acute level standard of care in denying C.M.'s claims. Rec. 00123.

In its enclosures, Blue Cross also included references to the InterQual® criteria for "Substance Use Disorders and Dual Diagnosis." Rec. 00141 – 00143. Blue Cross, however, never addressed C.M.'s substance use disorder or dual diagnosis under any such InterQual® criteria. Rather, Blue Cross relied exclusively on the InterQual® criteria for Adolescent

8

Psychiatry, despite knowing that C.M. had a substance use disorder and was enrolled in a dual diagnosis program as recently as August 2014. Rec. 00127.

Lauri appealed the denial of coverage in a letter dated December 8, 2014.   In her letter, Lauri stated that she did not receive a full copy of the criteria relied upon by Blue Cross to deny the claim and requested that, in the event Blue Cross maintained its denial, it provide a complete copy to her. Rec. 00131. Lauri also noted that Blue Cross appeared to be using an acute residential care criteria and explained that Waypoint provides subacute or intermediate residential care.   Lauri highlighted that the reviewer used the wrong criteria to evaluate C.M.'s treatment. Rec. 00132. Lauri included a copy of a psychiatric evaluation completed for C.M. by Brian L.B. Willoughby, Ph.D., which indicated a "high risk for suicidal ideation/intent and continued risk behaviors (e.g., cutting, substance abuse)" for C.M. Rec. 00154. She also included copies of up-to-date medical records compiled by Waypoint. Rec. 00156-00192. At this point in the appeals process, Lauri did not include letters from C.M.'s treating physicians, Dr. Robert Tella and Dr. Jedidiah M. Bopp. She also did not include any information regarding C.M.'s most recent suicide attempt in October 2014.

One day after receiving Lauri's appeal, in a letter dated December 12, 2014, Blue Cross maintained its denial of C.M.'s treatment, stating "the member's clinical condition does not meet the medical necessity criteria required for an *acute* residential psychiatric stay in the areas of symptoms/behaviors, social risk, and functioning." Rec. 00194 (emphasis added). The denial did not focus on C.M.'s substance abuse diagnosis, instead stating that "the member did not have thoughts of self-harm or suicide, behavior was safe, and he was never at risk of needing hospitalization." Rec. 00194 – 00195.

9

On March 27, 2015, Plaintiffs requested an external appeal of Blue Cross's denial of coverage.   Plaintiffs provided the external reviewer, Imedecs, a detailed history of C.M.'s behavior and treatment interventions together with letters and documentation from his providers outlining their reasons for recommending a higher level of care than intensive outpatient treatment. Rec. 00197-00466. Such documentation included letters from Dr. Robert Tella and Dr. Jedediah M. Bopp, Ph.D., C.M.'s two primary treating physicians, detailing their interactions and observations of C.M. These observations included the following:

From March 2013 through October 2014, Dr. Tella worked with C.M. and his family. He provided individual and family therapy, school consultation and collaborations with other therapists and providers.   Reflecting on the family's efforts, Dr. Tella explained that "[C.M.'s] condition worsened throughout the course of this comprehensive outpatient treatment program. The seriousness of his attempts to harm himself also grew in intensity to the point of presenting a lethal risk." Rec. 00246. Because of the increasing risk, Dr. Tella recommended that "without residential care and treatment, [C.M.]'s conditions would continue to worsen and threaten his prognosis and life." *Id.*

Dr. Bopp worked with C.M. as the program therapist at the McLean Hospital Acute Residential Treatment dual-diagnosis program and as C.M.'s private psychotherapist. Rec. 00205. Dr. Bopp warned that "[C.M.] requires round-the-clock therapeutic support to both teach him the skills necessary to manage his illness, but perhaps more importantly, to keep him safe and alive so he can learn those skills." Rec. 00206. Importantly, like the non-disclosure of C.M.'s October 2014 suicide attempt, Blue Cross did not receive Dr. Tella's or Dr. Bopp's observations until after the internal appeals process had been completed. However, Blue Cross

knew that both individuals were C.M.'s treating physicians at the time Blue Cross first denied

C.M.'s claim and could have contacted them for further information or input. Rec. 00127.

Despite these letters and the additional indicia that C.M. was suffering from mental

health issues and a substance use disorder, Imedecs upheld Blue Cross's denial of coverage on

May 27, 2015. Specifically, like Blue Cross, Imedecs determined that "*[a]cute* residential

psychiatric treatment at Waypoint Academy from 10-23-14 forward was not medically

necessary." Rec. 00670 (emphasis added). Imedecs also opined that there was "no evidence

presented in the medical record" that C.M. required "24 hour supervision associated with

[residential treatment center] care." *Id*. Like Blue Cross, Imedecs also failed to address C.M.'s

substance abuse diagnosis or consider a dual diagnosis treatment. Rec. 00669. Like Blue Cross,

Imedecs only used the InterQual® Adolescent Psychiatry criteria, completely ignoring the

InterQual® guidelines for substance abuse and dual diagnosis. *Id*.

Plaintiffs have exhausted all remedies under the Plan and have now brought suit to

recover their out-of-pocket expenses incurred at Waypoint.

## III.   LEGAL STANDARD

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In an ERISA case, when both

parties move for summary judgment, the parties "stipulate that no trial is necessary" and

"summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."   *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n,* 471 F.3d 229, 235 (1st Cir. 2006)).

### B.   Standard of Review

The parties disagree regarding the standard of review the court is to employ in reviewing Blue Cross's denial of benefits to Plaintiffs. Blue Cross argues that the court must employ an arbitrary and capricious standard because the Plan delegates discretionary authority to Blue Cross to interpret and apply the Plan's guidelines. Plaintiffs, by contrast, argue that the court should apply a *de novo* review because the Plan did not afford discretionary authority to Blue Cross and even if it did, Blue Cross violated ERISA's minimal procedural requirements to such an extensive degree that a *de novo* review is warranted.

### 1.   The Plan Delegates Discretionary Authority to Blue Cross

In ERISA cases, "a denial of benefits challenged under § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "Where the plan gives the administrator discretionary authority, however, 'we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey¸* 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *LaAsmar*, 605 F.3d at 796). The Tenth Circuit is "comparatively liberal

in construing language to trigger the more deferential standard of review under ERISA." *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002) (collecting cases). Indeed, the Tenth Circuit has found that an administrator retained discretion "where plan language defines 'needed' services as those determined by the plan administrator to meet certain tests, *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1256 (10th Cir. 1998), or where plan language entitled the plan administrator to label a procedure 'experimental,' *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996)." *Eugene S.*, 663 F.3d at 1132. The Tenth Circuit does not require "any magic words, such as 'discretion,' 'deference,' 'construe' or 'interpret' in order to find discretionary authority." *Gust v. Coleman Co.*, 740 F. Supp. 1544, 1550 (D. Kan. 1990), *aff'd*, 936 F.2d 583 (10th Cir. 1991).

Here, the Plan states that Blue Cross "decides which health care services and supplies . . . are *medically necessary* and appropriate for coverage. It will do this by using all of the guidelines described below." Rec. 00767. The Plan further states that if Blue Cross "determines that the proposed setting is not *medically necessary* for your condition," Blue Cross will call the health care facility. Rec. 00778. Finally, the Plan states that "[n]o benefits are provided for: . . . A service or supply that is not considered by [Blue Cross] to be medically necessary for you." Rec. 00813. The court concludes, under Tenth Circuit precedent, the Plan language is sufficient to grant Blue Cross discretionary authority.[3]

---

3 Plaintiffs argue that the court should adopt the reasoning of *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 428 (1st Cir. 2016), wherein the First Circuit found that language, identical to the language in Plaintiffs' Plan, failed to grant discretionary authority to Blue Cross. The First Circuit thus concluded that Blue Cross's benefits denial should have been reviewed under a *de novo*, rather than an abuse of discretion standard. Plaintiffs ask this court to apply the heightened First Circuit approach to the present case. The court must reject Plaintiffs' invitation. Under the Tenth Circuit's "comparatively liberal [approach] in construing language to trigger the more deferential standard of review under ERISA", *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1132 (10th Cir. 2011) – an approach which is controlling – the court finds the language to be sufficient to have granted discretionary decision-making authority to Blue Cross.

### 2.  However, Due to Substantial Procedural Irregularities, A *De Novo* Standard of Review Applies

Having determined that the Plan delegates discretionary authority to Blue Cross, the court's next query is whether ERISA's procedural regulations have been sufficiently observed as to uphold an arbitrary and capricious standard of review.   Blue Cross argues that any procedural irregularity was so minimal as to not deprive Plaintiffs of a full and fair review of their claims. Plaintiffs, by contrast, argue that the procedural irregularities were so severe that a *de novo* review is warranted. Having reviewed the record and the parties' arguments, the court finds that extensive procedural irregularities existed throughout the denial and appeals process, as described below. Thus, the court must employ a *de novo* standard of review.

ERISA's procedural regulations require the claims administrator, at the preliminary denial stage, to "provide the claimant with a comprehensible statement of reasons for the denial," and during the appeals process, to engage in a "full and fair review" that represents "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) (citation omitted). This "full and fair review requires knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented [by the claimant] . . . prior to reaching and rendering his decision." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (citation and internal quotation marks omitted). These requirements "further the overall purpose of [ERISA's] internal review process: to minimize the number of frivolous lawsuits; promote consistent treatment of claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims

settlement." *Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan,* 686 F.3d 1135, 1140 (10th Cir. 2012) (citation and internal quotation marks omitted).

Under Tenth Circuit precedent, a claim administrator's adverse benefits determination is only afforded a "deferential standard of review to the extent the administrator actually exercised a discretionary power vested in it by the terms of the Plan." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009). A "plan administrator is not entitled to the deference of arbitrary and capricious review when . . . the administrator made no decision to which a court may defer." *LaAsmar*, 605 F.3d at 798. If a claims administrator fails to render a decision on a demand for benefits, "the remedies [are] 'deemed exhausted' by operation of law rather than the exercise of administrative discretion, and *Firestone's* rule of deference does not apply." *Rasenack*, 585 F.3d at 1316 (quoting 29 C.F.R. § 2560.503-1(l)). Instead, *de novo* review applies.

"When applying a *de novo* standard, the court reviews a denial of benefits to determine whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 Fed. App'x 827, 832 (10th Cir. 2008) (unpublished) (citing *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002)). Under this standard, the court is not required to decide whether "'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review." *Id.* at 833. In other words, in the court's independent review, "the administrator's decision is accorded no deference or presumption of correctness." *Id.* at 832. Using this lens by which to evaluate Plaintiffs' claim, the court finds that a reversal of Blue Cross's denial decision is proper.

## IV.  ANALYSIS

ERISA provides:

> In accordance with regulations of the [Department of Labor], every employee
> benefit plan shall –
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim
>     for benefits under the plan has been denied, setting forth the specific reasons for
>     such denial, written in a manner calculated to be understood by the participant,
>     and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has
>     been denied for a full and fair review by the appropriate named fiduciary of the
>     decision denying the claim.

29 U.S.C. § 1133. In 2002, the Department of Labor established ERISA regulations which "set[]

forth minimum requirements for employee benefit plan procedures pertaining to claims for

benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1(a).

Subsection (g) of the regulations require that administrators make certain information

available to claimants, including (1) "[t]he specific reason or reasons for the adverse

determination;" (2) "[r]eference to the specific plan provisions on which the determination is

based;" (3) "[a] description of any additional material or information necessary for the claimant

to perfect the claim and an explanation of why such material or information is necessary;" (4)

"[a] description of the plan's review procedures and the time limits applicable to such

procedures;" and (5) for denials based on lack of medical necessity, "an explanation of the

scientific or clinical judgment for the determination, applying the terms of the plan to the

claimant's medical circumstances." *See id.* § 2560.503-1(g)(1)(i)-(v).

Subsection (h) requires the administrator to provide claimants with "a reasonable opportunity to appeal" through a process that must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim" and provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." *See id.* § 2560.503-1(h)(2)-(3)(iii), (iv). Relevant information is any material "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination." *See id.* § 2560.503-1(m)(8).

These procedural regulations were effectuated to aid in the "full and fair review" required under ERISA. Unfortunately, in the present case, these procedural regulations were not sufficiently observed, as detailed below.

### A.   Failure to Address Substance Use Disorder or Dual Diagnosis

Blue Cross violated ERISA regulations when it failed to address C.M.'s substance use disorder, either independently or in a dual diagnosis capacity. Blue Cross told Plaintiffs that it was employing InterQual® criteria to evaluate C.M.'s condition. Blue Cross then included a list of InterQual® criteria products which it had at its disposal to evaluate C.M.'s condition. Rec. 00141. "Adolescent Psychiatry" and "Substance Use Disorders & Dual Diagnosis" are both listed as available criteria for evaluation. Blue Cross, however, chose to only employ the "Adolescent Psychiatry" criteria, despite knowing of C.M.'s extensive substance use disorder and previous enrollment in a dual diagnosis program at McLean Hospital.

There is no question that C.M. suffered from a substance use disorder. The record reflects that C.M.'s outpatient treating physicians knew about his substance use disorder in the months

17

leading up to C.M.'s admission at Waypoint. Specifically, McLean Hospital records state that

C.M. was:

> presenting for treatment of comorbid depression, anxiety, and significant cannabis
> dependence among other substance use. It appears significant depression has long
> preceded drug use, but that things have acutely worsened over past 2 months, with
> [C.M.] attempting suicide three times in that time course. Biologically it appears
> there are sig neurovegetative sx of depression, worsening anxiety, insomnia and
> poor concentration; likely sig substance use makes these more difficult to treat. . .
> [C.M.] warrants Resi LOC for ongoing assessment, treatment and stabilization.

Rec. 00237. C.M. was hospitalized in the dual-diagnosis program for substance abuse as well as

for psychiatric needs. Rec. 00235.

Additionally, medical records indicate that he was being treated for substance use

disorder at Waypoint. On October 23, 2014, Waypoint noted that C.M. had a "High Risk Factor

for Adolescent Boys: Severe Depression and Hard Drug Use." Rec. 00190. On October 27, 2014,

Waypoint reported that C.M. "[r]eports history of substance use including marijuana, alcohol,

cocaine and LSD." Rec. 00173. On November 5, 2014, Waypoint noted that C.M. "has a history

of substance abuse.   He has had two hospitalizations at McLean Hospital in Boston. These were

within the last year. The first was due to a suicide gesture, and the second was due to depression

and issues relating to substance abuse." Rec. 00164. Blue Cross clearly was on notice that C.M.

had a significant substance abuse issue that was being addressed at the residential treatment

center.

Even Blue Cross recognized that C.M. was being treated for a substance use disorder. In

its preliminary denial letter, Blue Cross stated: "We received the following information

regarding this request: anxiety disorder, depression, ADHD, and substance use." Rec. 00123.

Using its own InterQual® criteria, Blue Cross noted that C.M. had been "[a]dmitted to mclean

again in august 2014 for dual diagnosis treatment" and that he has "daily cannabis and alcohol

use, is reporting periods of time for two weeks where he used cocaine daily . . . [and] also reportedly took some lsd with some friends at school on the 10/17/14 and had a negative experience with this." Rec. 00127.

And yet, despite this vast evidence of C.M.'s substance use disorder, and Blue Cross's knowledge of such disorder, Blue Cross only applied the InterQual® Adolescent Psychiatry criteria, stating "we have determined that the member's clinical condition does not meet the medical necessity criteria required for acute psychiatric inpatient stay in the area of immediate safety risk." Rec. 00123. In its second level of appeal, Blue Cross stated that "the member has engaged in substance abuse" and "we have determined that the member's clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the areas of symptoms/behaviors, social risk, and functioning." Rec. 00194.

These two sentences are the sum total of Blue Cross's analysis of C.M.'s substance use diagnosis. Nowhere in the initial denial stage or appeals process did Blue Cross address C.M.'s substance use disorder or dual diagnosis, or provide an analysis concerning the medical necessity of his treatment for that condition. Indeed, rather than also applying the Substance Use Disorder and Dual Diagnosis criteria which was listed within the materials originally given to Plaintiffs, Rec. 00114, Blue Cross chose to ignore that criteria and simply evaluate C.M.'s condition based on the Adolescent Psychiatry criteria. Blue Cross's failure to address C.M.'s substance use disorder or dual diagnosis in its initial denial of benefits violates subsection (g) of ERISA's procedural regulations because Blue Cross did not provide the "specific reason or reasons for the adverse determination" for benefits related to C.M.'s substance use diagnosis. *See* 29 C.F.R. § 2560.503-1(g)(1)(i); *see also Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250,

1270 (D. Utah 2020) (finding that administrator's failure to consider a substance use disorder warranted reversal and remand).

By failing to consider and analyze C.M.'s substance use disorder or dual diagnosis, Blue Cross did not provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances" as required by Section 2560.503-1(g)(1)(v)(B). Further, by failing to consider the separate diagnosis, Blue Cross did not "take into account all comments, documents, records, and other information submitted by the claimant relating to the claim," which violates Section 2560.503-1(h)(2)(iv) of ERISA.   Simply put, ERISA's procedural safeguards exist to require administrators to engage in a "meaningful dialogue" with claimants through a "full and fair review." Blue Cross's failure to consider C.M.'s independent substance use condition or dual diagnosis violates these procedural safeguards and such violations warrant reversal of Blue Cross's denial of benefits.

### B.   Failure to Apply or Explain the Subacute Level of Care

In the InterQual® Review Summary which was given to Plaintiffs, Blue Cross notated the following information concerning C.M.'s condition:

- "Started experimenting with drugs and alcohol. Two suicide attempts, hospitalized in march or april 2014, admitted to mclean. Admitted to mclean again in august for 2014 dual diagnosis treatment. Member reports intermittent suicidal ideation since seventh grade." Rec. 00127.

- "[M]ember has a history of cutting and self harm. Member says he hasn't cut since august 2014." *Id*.

- "[D]aily cannabis and alcohol use, is reporting periods of time for two weeks where he used cocaine daily, parents are not reporting this, member also reportedly took

some lsd with some friends at school on the 10/17/14 and had a negative experience with this." *Id*.

After listing this indicia, Blue Cross stated that the Requested Level of Care was "Psychiatric Subacute Care." *Id*. Blue Cross then enclosed the Adolescent Psychiatry InterQual® criteria, which lists both Psychiatric Subacute Care/Psychiatric Residential Treatment Center, Psychiatric Therapeutic Group Home, and Psychiatric Intensive Community-Based Treatment levels of care. However, in denying C.M.'s claim, Blue Cross stated that C.M. did not qualify for "*acute* psychiatric inpatient stay" and instead qualified for "treatment at an intensive outpatient program level of care." Rec. 00123. Blue Cross did not explain how or under which criteria C.M. failed to qualify for either subacute or acute care. This one sentence is the extent of Blue Cross's explanation to Plaintiffs.

Upon seeing the acute reference, Plaintiffs notified Blue Cross that a subacute level of care analysis should have been applied when evaluating C.M.'s claim instead of an acute analysis. Plaintiffs made this assertion throughout the claims and appeals process, Rec. 00132 and 00199, and now argue that unlike the acute treatment C.M. received at McLean hospital in the Adolescent Residential Treatment Center, Waypoint is a subacute treatment center – a center that treats patients at a more intense level than outpatient programming but not as intense as those at acute treatment centers. Plaintiffs contend that because the Plan provides for intermediate treatment, Blue Cross should have analyzed C.M.'s level of care at a subacute level. Blue Cross counters by arguing that it applied the correct InterQual Adolescent Psychiatric Residential Treatment criteria and under that criteria, C.M. did not qualify for treatment under either an acute or subacute level of care and therefore, the distinction is irrelevant.   Moreover, Blue Cross argues that C.M. did not satisfy the conditions of the subacute standard of care

21

because he had not been immediately discharged from a psychiatric hospital prior to entering Waypoint.

Blue Cross's argument misses the point. ERISA procedural regulations are implemented to secure a full and fair review of a claimant's case. They exist to enable the claims administrator and the claimant to have a "meaningful exchange" regarding the claims process and to ensure that the claimant is aware of why his claim has been accepted or denied. Here, Blue Cross has failed to engage in this meaningful dialogue and has violated several procedural safeguards, which, had they been respected, would have placed Plaintiffs on notice of why C.M.'s case was being reviewed under an acute level of care. Indeed, it was arguably not until receiving Blue Cross's briefing in the instant motions for summary judgment that the acute/subacute level of care analysis was explained to Plaintiffs. By failing to properly observe the procedural regulations, Plaintiffs were not allowed to meaningfully engage with Blue Cross, as evidenced by their repeated requests to analyze C.M.'s case under a subacute level of care – requests that were unequivocally ignored by Blue Cross at all stages of review and appeal.

As previously explained, section (g) requires that claims administrators provide both the "specific reason or reasons for the adverse determination," 29 C.F.R. § 2560.503-1(g)(1)(i), and "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." *Id.* § 2560.503-1(g)(1)(v)(B). From their very first letter to Blue Cross regarding the adverse benefits determination, Plaintiffs requested that C.M.'s claim be reviewed on a subacute level. Rec. 00132. At the second level of review, Plaintiffs again requested that the review be addressed under a subacute level of review. Rec. 00199. At each phase, Plaintiffs asked why Blue Cross was using an acute analysis when subacute applied.   And at each and every phase, there was no response from Blue Cross. Blue

Cross's failure to engage with Plaintiffs and tactically ignore the issue of subacute level of care was a violation of ERISA's procedural safeguards to such a degree that reversal of Blue Cross's denial decision is appropriate.

### C.   Failure to Assess All Medical Information

Finally, the court finds that Blue Cross violated ERISA procedural safeguards by failing to address and evaluate all relevant available medical information concerning C.M. The record shows that there was substantial contrary evidence to support a finding that C.M.'s treatment at Waypoint was medically necessary.   "The court must view the substantiality of the evidence supporting the administrator's denial 'based upon the record as a whole,' by 'tak[ing] into account whatever in the record fairly detracts from its weight.'" *Raymond M.*, 463 F. Supp. at 1283 (citations and internal quotations marks omitted). In other words, it is improper for claims administrators to "cherry-pick" the information that is helpful to their decision to deny a benefits claim while simultaneously "shut[ting] their eyes to readily available information" that "might confirm the beneficiary's theory of entitlement" to benefits. *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).   To do so would classify the administrator's decision as arbitrary because the claims "administrator . . . ignored evidence that was relevant to her decision" and "based her decision on a skewed reading of [the claimant's] medical records." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1284 (10th Cir. 2002); *see also James F. v. Cigna Behavioral Health, Inc.*, 2010 WL 5395075, at *6 (D. Utah Dec. 23, 2010) (reversing a denial of benefits because the administrator "selectively reviewed the medical information and ignored relevant evidence").

Here, it is apparent Blue Cross arbitrarily cherry-picked information in the record to support its denial of benefits and ignored substantial evidence that C.M.'s treatment at Waypoint was indeed medically necessary. The record contains substantial evidence that C.M. struggled to manage his mental health as well as his substance use disorder, all of which had been relayed to Blue Cross for its determination. To name a few:

- On November 26, 2014, Blue Cross's own InterQual ® Summary states: "Started experimenting with drugs and alcohol. Two suicide attempts, hospitalized in march or april 2014, admitted to mclean. Admitted to mclean again in august for 2014 dual diagnosis treatment. Member reports intermittent suicidal ideation since seventh grade." Rec. 00127.

- The November 26, 2014 InterQual® Summary also states: "mood depressed, affect flat, eye contact avoidant, speech is very slow . . . member has a history of cutting and self harm. Member says he hasn't cut since august 2014." *Id.*

- Further, the Summary describes C.M.'s substance abuse as "daily cannabis and alcohol use, is reporting periods of time for two weeks where he used cocaine daily, parents are not reporting this, member also reportedly took some lsd with some friends at school on the 10/17/14 and had a negative experience with this." *Id.*

- The InterQual® Summary also lists C.M.'s psychiatrists, Dr. Jedd Bob and Dr. Tella as well as his therapist, Dr. Suz Rabin. It appears Blue Cross did not follow up with any of these providers – each of whom independently recommended residential treatment – in making its medical necessity determination.

- C.M.'s treating physician, Dr. Willoughby, indicated that C.M. is "at high risk for suicidal ideation/intent and continued risk behaviors (e.g., cutting, substance abuse)" and that C.M. "has required inpatient hospitalization." Rec. 00153.

- Dr. Willoughby's report also states that C.M. "has reported increased sadness, cutting behaviors, anxiety, and suicidal ideation. In March 2014, he required hospitalization McLean Hospital's Dual Diagnosis program following suicidal ideation and polysubstance use behaviors." Rec. 00151.

24

- Waypoint's medical records, to which Blue Cross had access, indicate C.M. "has emotional outbursts, and lacks self-control. . .  He was hospitalized on two occasions for an overdose and an accidental overdose." Rec. 00159

- Waypoint's records also alerted Blue Cross that C.M. "has a history of substance abuse. He has had two hospitalizations at McLean Hospital in Boston. These were within the last year. The first was due to a suicide gesture, and the second was due to depression and issues relating to substance abuse." Rec. 00164.

The court notes that these are not the only, nor even the most compelling indicia of C.M.'s mental health and substance abuse struggles.   As is detailed in the record as a whole, which was only compiled for the external review of C.M.'s claim, C.M.'s treating physicians, psychiatrists and education consultants unequivocally advised that C.M. needed residential treatment as soon as possible – advice, which Plaintiffs heeded.

Of the only treating physician record that was submitted to Blue Cross – that of Dr. Willoughby – it appears that Blue Cross ignored it in its entirety.[4] While ERISA does not require plan administrators to afford special deference to the opinions of treating physicians, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).   Here, Dr. Willoughby stated that C.M. was "at high risk for suicidal ideation/intent and continued risk behaviors (e.g., cutting, substance

---

4  There is a dispute between the parties as to the correct date of Dr. Willoughby's letter. Rec. 00150-155.   The letter is dated May 20, 2013, but references C.M.'s hospital stays in 2014 and that C.M. is a "14-year, 10-month-old boy", which was C.M.'s age in May 2014, not May 2013. Accordingly, the court concludes that the date of the letter was inadvertently mistyped and should read May 20, 2014. This conclusion makes Dr. Willoughby's letter even more relevant due to its proximity to C.M.'s fall 2014 admission into Waypoint.   Irrespective of the date, Blue Cross should have considered Dr. Willoughby's treating physician letter, which states that C.M. is "at high risk for suicidal ideation/intent and continued risk behaviors (e.g., cutting, substance abuse) . . ." Rec. 00154.   If there were concerns as to date or authenticity, Blue Cross had every option to contact Dr. Willoughby or confer with Scott and Lauri themselves.   Indeed, Lauri's letter states "if there are any questions, please contact me." Blue Cross's refusal to consider the Willoughby letter highlights its insufficient dialogue with Scott and Lauri – a dialogue that is required under ERISA guidelines.

abuse)" and that C.M. "has required inpatient hospitalization." Rec. 00153.   Dr. Willoughby

further stated:

> Since his previous evaluation in October 2011, [C.M.] has experienced a
> significant decline in psychological health. His depressive and anxiety symptoms
> have intensified, especially within the past several months. C.M. has reported
> increased sadness, cutting behaviors, anxiety, and suicidal ideation. In March
> 2014, he required hospitalization McLean Hospital's Dual Diagnosis program
> following suicidal ideation and polysubstance use behaviors. He was discharged
> from McLean following a month stay, though has continued to show signs of
> marked emotional distress.

Rec. 00151.

In its denial letter, Blue Cross neither referred to Dr. Willoughby's report, nor indicated

that Blue Cross had either considered the report or made contact with Dr. Willoughby to resolve

any concerns. Simply put, the opinions of treating physicians "may not be ignored, especially

when treating physicians – in contrast to reviewers evaluating a medical file – have 'a greater

opportunity to know and observe the patient as an individual.'" *Dewsnup v. Unum Life Ins. Co.*

*of Am.*, 2018 WL 6478886, at *10 (D. Utah Dec. 10, 2018) (quoting *Nord,* 538 U.S. at 832). Blue

Cross's failure to address Dr. Willoughby's letter was violative of ERISA procedural

safeguards.[5]

---

5 This is even more compelling considering the substantial evidence in the record, developed after Blue Cross made
its claim determination, highlighting the unanimous advice and reasoning of every one of C.M.'s treating physicians
that he needed immediate inpatient treatment.   *See, e.g.,* Letter from Dr. Robert Tella: "It is critical to understand
that [C.M.'s] condition worsened throughout the course of this comprehensive outpatient treatment program. The
seriousness of his attempts to harm himself also grew in intensity, to the point of presenting a lethal risk. It is my
impression that without residential care and treatment, [C.M.]'s condition would continue to worsen and threaten his
prognosis and life." Rec. 00246; Letter from Dr. Jedediah M. Bopp, stating "While his family went to herculean
efforts to support [C.M.] and to keep [C.M.] safe, it is clear to me that [C.M.] requires round-the-clock therapeutic
support to both teach him the skills necessary to manage his illness, but perhaps more importantly, to keep him safe
and alive so he can learn these skills." Rec. 00248. Blue Cross had knowledge of and access to both of these
physicians from its very first consideration of Plaintiffs' claim but failed to contact them.

Blue Cross reviewers cited no evidence throughout the claims review process that they either considered the treating physicians' opinions, or asked Plaintiffs for further support, even though the latter was amenable to such. Instead, Blue Cross only prepared conclusory statements that C.M.'s "clinical condition does not meet the medical necessity criteria required for acute psychiatric inpatient stay in the area of immediate safety risk." Rec. 00123. While the Plan states that Blue Cross "decides which health services and supplies that you receive (or you are planning to receive) are *medically necessary* and appropriate for coverage", Rec. 00767, Blue Cross "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834. Should Blue Cross have had further questions about Dr. Willoughby's diagnosis, Blue Cross should have contacted Dr. Willoughby directly, or at the very least, contacted Plaintiffs for further clarification of the date of the letter and treatment. Because Blue Cross's denial letters repeatedly failed to indicate that they considered C.M.'s treating physician opinion at all, the court finds that Blue Cross's decision violated ERISA's procedural safeguards and must therefore be reversed.

### D.   MPHAEA Violation

Finally, Plaintiffs contend that Blue Cross violated the Mental Health Parity and Addiction Equity Act ("the Parity Act") by failing to cover subacute residential care while simultaneously covering subacute treatment for medical/surgical conditions such as inpatient skilled nursing, rehabilitation and hospice care. Blue Cross counters that there was no Parity Act violation because Blue Cross did not deny Plaintiffs' claim for benefits based on a residential treatment exclusion, or subacute residential treatment exclusion, but rather because C.M.'s condition did not meet the initial InterQual® criteria for residential treatment. Because the court has determined that reversal of Blue Cross's benefits decision is appropriate given the serious

procedural irregularities in the claims and appeals process, the court does not reach the issue of whether the Parity Act was violated.

## V.   REMEDY

### 1.   Reversal and Remand

If, upon review of the administrative record, the court determines that a plan administrator improperly denied benefits, the court must determine the appropriate remedy. *See Spradley v. Owens-Ill. Hourly Emp. Welfare Benefit Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012). The court "may either remand the case to the plan administrator for renewed consideration of the claimant's case or . . . order an award of benefits." *Flinders v. Workforce Stabilization Plan of Philips Petro. Co.*, 491 F.3d 1180, 1194 (10th Cir. 2007) (citations omitted), *abrogated on other grounds by Metro Life Ins. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L.Ed.2d 299 (2008). Remand is the appropriate remedy when the administrator "failed to make adequate factual findings or failed to adequately explain the grounds for the decision." *Spradley*, 686 F.3d at 1142.

Here, Blue Cross failed to make adequate findings because it did not evaluate C.M.'s substance use diagnosis and the medical necessity of a subacute level of treatment. Moreover, Blue Cross was not able to fully evaluate C.M.'s claims as a more complete record was not submitted until March 27, 2015, five months after Plaintiffs' appeal of Blue Cross's denial of benefits.   The record contains letters and statements of therapists and psychologists which are critical to analyzing whether C.M.'s treatment was "medically necessary." The court hereby remands the case for Blue Cross to provide a full and fair evaluation of Plaintiffs' claims. Blue Cross should consider the medical records, the services rendered by Waypoint, the appropriate

level of care, and all applicable diagnoses. On remand, Blue Cross shall state and list expressly the levels of care being applied, list each relevant criteria and state in detail the facts considered in applying the criteria with citations to the administrative record. The review shall include a dual analysis for both substance abuse and subacute care and explain, again with reference to the administrative record, how each has been considered and applied. Blue Cross shall identify each of the reviewers and their credentials. The court will retain jurisdiction over this matter until the review on remand is completed and the parties have stated to the court that the review has fairly and completely applied the correct criteria and applicable provisions as required by the Plan. The Plaintiffs may raise with the court by further motion any failure by Blue Cross to comply with the court's order on remand.

### 2. Prejudgment Interest

An award of prejudgment interest is appropriate when it "serves to compensate the injured party and its award is otherwise equitable." *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002). Because the court remands this matter to Blue Cross, the court reserves ruling on an award of prejudgment interest.

### 3. Attorney Fees and Costs

Under the ERISA statutory scheme, the court "in its discretion may allow a reasonable attorney's fee and costs of action," 29 U.S.C. § 1132(g)(1), when a "claimant has achieved some degree of success on the merits." *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citation and internal quotation marks omitted). The Tenth Circuit has provided the following factors to guide the court's determination:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983). "No single factor is dispositive and a court need not consider every factor in every case." *Cardoza*, 708 F.3d at 1207.

In weighing the relevant factors, the court finds that an award of attorney fees in this case is appropriate. First, while the court has not found bad faith on the part of the plan administrator, Blue Cross failed to properly evaluate C.M.'s substance use disorder, failed to apply or discuss the reasoning behind its failure to apply a subacute level of care, and committed other serious procedural irregularities. Second, Blue Cross has the ability to satisfy an award of attorney fees. Third, awarding attorney fees against Blue Cross can reasonably be expected to deter plans and administrators from disregarding ERISA's minimum procedural regulations in the future. And fourth, Plaintiffs have successfully proven on multiple grounds that Blue Cross's decision violated many of ERISA's procedural regulations. Accordingly, the court awards Plaintiffs their reasonable attorney fees and costs, as defined by 28 U.S.C. § 1920, incurred in prosecuting this matter.

**ORDER**

For the foregoing reasons:

1. Defendant's motion for summary judgment is DENIED (ECF No. 60);

2.   Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART
(ECF No. 61);

     a.   The court DENIES Plaintiffs' request for an order awarding benefits under the Plan;

     b.   The court reserves ruling on Plaintiff's request for prejudgment interest; and

     c.   The court GRANTS Plaintiffs' motion to find Blue Cross violated ERISA's
procedural regulations and remands this case for reconsideration;

3.   Plaintiffs' request for attorney fees and costs is GRANTED. Within twenty-one days of this
order, Plaintiffs' counsel should submit a petition for reasonable attorney fees and costs
associated with this action, including an affidavit indicating a calculation of fees, an accounting
of time, and costs.

4.   Defendant's decision denying Plaintiffs benefits for services at Waypoint is REVERSED and
this matter is remanded to Blue Cross for further proceedings consistent with this Order.

     DATED this 24th day of March, 2021.


               BY THE COURT:


               CLARK WADDOUPS
               United States District Judge